**SIGNED THIS: September 12, 2007**

_____
**THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MARGARET ANN BERRY, | ) | No. 05-85079 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| WADE C. BERRY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 05-8339 |
| | ) | |
| MARGARET ANN BERRY, | ) | |
| Defendant. | ) | |

O P I N I O N

This matter is before the Court for decision after trial on the amended complaint filed by Wade C. Berry (WADE), the Plaintiff, against Margaret A. Berry, the Debtor (DEBTOR), seeking a determination that certain credit card obligations which she agreed to pay in the parties' marital settlement agreement are nondischargeable pursuant to

Sections 523(a)(2)(A) and (a)(15). In the alternative, WADE seeks a denial of the DEBTOR'S discharge under Sections 727(a)(2), (a)(3), (a)(4) and (a)(7) of the Bankruptcy Code.

WADE and the DEBTOR were married on April 19, 1985. Their only child, Matthew Berry, was born on May 16, 1987. Both parties were employed full-time during the marriage. In August, 1999, the parties purchased a home with twenty acres in Pekin, Illinois, for $275,000. A tornado struck the marital residence in 2003, doing considerable damage and necessitating the replacement of the roof and the porch. Insurance proceeds of $80,000 to $100,000 were used to repair the damage.

The parties separated in September, 2003, and WADE filed a petition for dissolution of marriage. WADE moved to Lexington, Illinois, and the DEBTOR remained in the marital home. According to the affidavit filed by the DEBTOR in the dissolution proceedings, the only joint credit card debt was owed to MBNA MasterCard in the amount of $24,000. In mid November, 2004, the parties entered into a property settlement agreement which was incorporated into a judgment of dissolution entered by the state court on December 17, 2004. Among other things, the agreement awarded the DEBTOR the marital residence, the bank account at Herget National Bank, a 1997 Chevrolet Tahoe and a 1988 Chevrolet Pickup. The agreement provided that the DEBTOR was to assume the two mortgages on the marital residence and the debts on the vehicles and to hold WADE harmless thereon.

WADE was awarded two vehicles and the following nonmarital assets: Reece Construction Profit Sharing account - $134,000; A.G. Edwards account - $16,000; MONY Market Account - $5,900; A.G. Edwards account (jointly held with brothers) - $14,000; and

2

his one-third interest in 434 acres in Kansas. While each party was awarded their pension accounts, WADE was directed to pay the DEBTOR $51,431.70, representing the net funds available, after payment of penalties and taxes, from a distribution of $75,000 from his retirement account.

In addition, the agreement provided that the DEBTOR would be responsible for payment of the balances owed on the MBNA MasterCard account in the amount of $24,000, the AT&T Universal Card account and the Discover credit card accounts. Within fourteen days of the entry of the judgment, WADE was required to pay $8,000 to the DEBTOR for his share of the credit card debt which the DEBTOR assumed. The DEBTOR was required to apply that payment to the MBNA MasterCard account. The agreement also provided that the credit card accounts which were held in the joint names of the DEBTOR and WADE would be immediately closed and that no further charges would be made against those accounts. Because the DEBTOR received and spent the insurance proceeds payable from the destruction of a recreational vehicle which WADE had inherited from his father, she agreed to pay for the first two years of their son's college expenses.[1]

Upon finalization of the divorce, in accordance with the parties' agreement, the DEBTOR received approximately $51,000 from WADE, in payment of the net proceeds from the distribution of $75,000 withdrawn from his retirement fund. From these proceeds, the DEBTOR made a $16,000 payment on the MBNA MasterCard. WADE also made the payment of $8,000 called for by the agreement. After those payments, the MBNA MasterCard balance was reduced to $1,200.

---

[1] According to WADE'S testimony, the amount of the insurance proceeds was $31,000.

The DEBTOR refinanced the first mortgage, reducing the payment from $1,741 to interest only payments of $904.17.² She also obtained a home equity line of credit with a credit limit of $15,500. She borrowed $5,700 from her brother in order to pay her attorney fees. In the spring of 2005, the DEBTOR listed ten acres of her homestead for sale, intending to sell off lots for $9,000 per acre.

In January of 2005, WADE left a full time job with Harker's Distribution to pursue a business known as Market America, which he had begun developing in late 2003, having been recruited by one of his brothers. He testified that he has never devoted more than ten hours per week to that business, explaining that by doing so at this stage, he would not turn a profit, but only increase his costs.

The DEBTOR filed a Chapter 7 petition on September 25, 2005. She listed her residence as having a value of $270,000, subject to a first mortgage of $248,000 and a second mortgage of $15,600. She also listed credit card debt of $52,840.16.³ WADE filed this adversary complaint, seeking a determination under his amended complaint that the outstanding balance on the debt owed to AT&T Universal Card in the amount of $26,691.43 and the balance owed on the MBNA MasterCard in the amount of $2,900.00 were nondischargeable pursuant to Sections 523(a)(15) and (a)(2)(A).⁴ In Count III of the amended complaint, WADE sought denial of the DEBTOR'S discharge under Sections 727(a)(2), (3), (4) and (7). A trial was held on April 10, 2007, and April 19, 2007. Both

---

²According to the financial affidavit submitted by the DEBTOR in the state court, the payment on the first mortgage was $1,741. The payment on the home equity loan was $164.

³Also included in the DEBTOR'S list of unsecured creditors were two small medical claims totaling $422.89.

⁴The parties stipulated to the balances of the two debts at issue as of October, 2005. According to a statement issued by AT&T Universal Card in October, 2005, the annual percentage rate of interest was 30.780%. In his amended complaint, WADE also sought a determination of nondischargeability as to the DEBTOR'S obligation to hold him harmless on two Discover credit cards and the balance owed on an E*TRADE Financial Account. Prior to trial, WADE determined that his name was not on those accounts.

4

WADE and the DEBTOR testified. At the Court's direction, each submitted current balance sheets reporting assets and liabilities and income and expense statements. That financial information is summarized in the following chart:

|  | WADE | MARGARET |
|---|---|---|
| **Monthly Income:** | | |
| Wages | 100.00 | $3,134.71 (Job #1) |
|  |  | 513.07 (Job #2) |
| Farm Rent | 1,000.00 | 00.0 |
| Payroll Deductions | (300.00) | (1,231.50) |
| Net monthly income | 800.00 | 2,416.28 |
| Monthly living expenses | (2,158.57) | (2,567.59) |
| Disposable Income | (1,358.57) | (151.31) |
| **ASSETS:** | | |
| Cash | 4,200.00 | 0.00 |
| Personal property | 0.00 | 600.00 |
| Real estate | 80,000.00 | 6,711.00 |
| Retirement Accts | 219,542.00 | 32,131.26 |
| Insurance | 7,244.00 | 0.00 |
|  | $310,966.00 | $39,442.26 |
| **DEBTS:** | | |
| Credit card (other than debts at issue) | 1,100.00 | 0.00 |
| Medical expenses | 0.00 | 1,761.50 |
| Attorney fees | 0.00 | 3,750.00 |

|  |  |  |
|---|---|---|
| *Other debts* | <u>0.00</u> | <u>5,162.50</u> |
|  | $1,100.00 | $10,674.00 |

*Adjusted Net Equity*
*(Without regard to debts*
 *at issue)*                        $309,866.00                     $28,768.26

Both parties submitted their 2006 income tax returns. The DEBTOR had adjusted gross income for 2006 of $49,940. Of that amount, $8,746.43 was from Macy's and $41,144 was from Coca-Cola. WADE had adjusted gross income of $16,989, which included a taxable distribution from his IRA in the amount of $15,000. His business venture, Market America, had gross sales of only $1,097 against costs of goods sold of $2,063, yielding a gross income of negative $966 and, after deducting expenses (including car expense of $5,652 and travel expenses of $2,016), resulted in a net loss of $10,395. WADE received farm rental income of $4,029, from which he deducted $1,120 for taxes and $2,909 for trips to Kansas, resulting in net income of only $1,512.

The DEBTOR, a two-time cancer survivor, is fifty-three years old.[5] She began working a second job at a department store in December, 2006. The parties' son, almost twenty years old at the time of trial, continues to reside with her and attends junior college. Though he works part-time during the construction season, his earnings go to his car payments, transportation expenses and lunches at work or school. He does not contribute to his college expenses nor does he pay any rent. The DEBTOR testified that after the divorce, she suffered from depression and would spend time at the gambling boat in order to escape her problems. Between her two jobs, she works 75 to 80 hours each week. The DEBTOR testified that she anticipates that her income from Coca-Cola will decrease, due

---

[5]The DEBTOR had breast cancer in 1993 and was later diagnosed with and treated for skin cancer.

6

to a shift in the company's policy from basing incentives on individual performance to unit performance. She no longer expects to receive bonuses from $7,000 to $8,000, but believes that the maximum bonus will be $1,800.

Although the original prediction of a start-up period of two to three years for Market America has not panned out, WADE continues to believe that the company will eventually take off and that his earnings will be from $300 to $25,000 per week. At present, WADE is only earning $100 per month. Because his income is insufficient to meet his expenses, he relies on his savings and retirement accounts to make up the shortfall. According to his testimony, the balance on the AT&T Universal Card was only $962 in May, 2004.[6] WADE testified that he believes that the fair market value of the former marital residence is $310,000.

Closing arguments were made on April 24, 2007 and the matter was taken under advisement.

## *ANALYSIS*

*Nondischargeability of Debt*

*Section 523(a)(15)*

Section 523(a)(15), as it applies here, aptly characterized as "an exception to an exception to discharge," provides that a discharge issued under Section 727 does not discharge a debtor from a debt:

> (15) not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or territorial law by a

---

[6] While the record contains no specific documentation of this fact, this Court notes that the financial affidavit submitted by the DEBTOR in the divorce proceedings makes no mention of the account.

governmental unit unless–

>   (A)  the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation , and operation of such business; or
>
>   (B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor.

11 U.S.C. § 523(a)(15).[7]  Once a creditor establishes that the debt is one incurred in connection with a divorce and is in the nature of a property settlement debt as opposed to a debt for maintenance or support,  the burden shifts to the debtor to establish either (1) an inability to pay the debt; or (2) the benefit to the debtor of discharging the debt outweighs any detriment to the former spouse. *Matter of Crosswhite*, 148 F.3d 879 (7th Cir. 1998).  If the debtor does not have the ability to pay, the debt is discharged.  Only if the debtor has the ability to pay does the court then turn to Section 523(a)(15)(B) to determine whether the benefit of granting the discharge to the debtor outweighs the detriment that the discharge would cause the creditor.

Preliminarily, the Court must address an issue raised by the DEBTOR in her closing argument.  Contending that the credit card companies cannot legally hold WADE liable for any charges made after the divorce, she asserts that those debts are not nondischargeable. The DEBTOR'S supposition is incorrect.[8]  More accurately framed, the

---

[7]The Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA), which became effective on October 17, 2005, eliminated the exceptions found in Section 523(a)(15)(A) and (B), rendering all divorce-related debts nondischargeable.  Because this bankruptcy case was filed on September 25, 2005, prior to BAPCPA'S effective date, the pre-BAPCPA version of Section 523 is applicable.

[8] *See In re Dill*, 300 B.R. 658, 668, n. 9 (Bankr.E.D.Va. 2003).

8

inquiry is whether the post-judgment charges constitute debts "incurred by the debtor... in connection with ... a divorce decree." In *In re Schweitzer*, 370 B.R. 145, 152-53 (Bankr.S.D. Ohio 2007), the court rejected the debtor's contention that credit card charges made after the parties divorce was finalized were not debts "incurred in connection with a separation agreement" within the meaning of Section 523(a)(15), noting:

> The fact that the credit card charges were incurred after the parties' divorce became final does not alter the Court's conclusion. Several bankruptcy courts have addressed the situation in which a debtor incurred post-divorce credit card debt to the detriment of a non-filing former spouse. In *Melton v. Melton (In re Melton),* 228 B.R. 641 (Bankr.N.D.Ohio 1998), a case decided under the pre-BAPCPA, "balancing test" version of § 523(a)(15), the divorce decree provided that "[t]he parties hereto agree to pay all debts incurred by him or her subsequent to the date of their separation, and to save the other party harmless from any liability thereon." *Id.* at 643. After the divorce was finalized, the debtor reactivated a joint credit card account and made charges on the card. The *Melton* court found that the debt was "undisputably incurred in connection with the parties' divorce decree," *id.* at 645, and held that the debtor's obligation to repay his former wife for the debts incurred was nondischargeable. *Id.* at 647. *See also Schmitt v. Eubanks (In re Schmitt),* 197 B.R. 312, 316-17 (Bankr.W.D.Ark.1996) (holding that a debtor's obligation to indemnify her former husband for credit card debts she incurred post-divorce was nondischargeable under § 523(a)(15), despite the absence of "hold harmless" language, because the divorce decree had provided that each party would be responsible for any debts incurred by that party after their divorce); *Baker v. Baker (In re Baker),* 274 B.R. 176 (Bankr.D.S.C.2000) (same). As in *Melton, Schmitt* and *Baker,* the Separation Agreement in this case contains a provision governing debts incurred post-divorce:
>
>> Neither Husband nor Wife may hereafter incur any debts or obligations upon the credit of the other and each shall indemnify, defend and save the other absolutely harmless from any debt or obligation so charged or otherwise incurred.
>
> Separation Agreement ¶ 15. The Separation Agreement expressly prohibits either spouse from using the other's credit. It also provides for indemnification if such debts are incurred in violation of this provision. The situation that gives rise to this adversary proceeding – in which Deborah has incurred debt for which Vincent may be held jointly liable – is precisely the type of scenario that the hold harmless provision was intended to address. The fact

9

> that the underlying debts were incurred months after the divorce thus has no bearing on whether Deborah's obligation to hold Vincent harmless on those debts is dischargeable.

This Court agrees with that conclusion.[9]

Under Section 523(a)(15)(A), the court must determine whether a debtor is able to pay the obligations at issue. In making this determination, the majority of courts employ an analysis similar to that applied in a disposable income analysis under Chapter 13. *In re Brown*, 302 B.R. 637 (Bankr.N.D.Iowa 2003); *In re Brasslett*, 233 B.R. 177 (Bankr.D.Me. 1999). The DEBTOR contends that she does not have the ability to pay the credit card debts. In order to meet her burden of proof on the "ability to pay" defense, she must establish that paying the obligations in question would reduce her available income below that necessary to support herself and her son. According to the affidavit submitted by the DEBTOR, her net monthly income is $2,416.28. Taking the position that the DEBTOR is not entitled to deductions for her voluntary payment into her 401(k) retirement plan or for her voluntary 401(k) loan repayments, WADE contends that the DEBTOR has net income of $4,010.[10]

Under the majority rule which prevailed at the filing of the DEBTOR'S petition, voluntary contributions to a retirement plan were not considered to be a reasonably necessary expense in determining a debtor's disposable income under Chapter 13. *In re*

---

[9]*But see In re Petty*, 333 B.R. 472 (Bankr.M.D.Fla. 2005) (new debt representing post-divorce charges not within Section 523(a)(5) or (a)(15) of the Bankruptcy Code). While the court in *Petty* granted the debtor's former spouse relief from the stay to pursue whatever remedies she might have in state court, in this Court's view, that is a less than satisfactory result. When a debtor files bankruptcy both the debtor and his or her former spouse are entitled to a determination whether their obligations to one another are discharged or remain binding debts.

The DEBTOR testified that she unsuccessfully attempted to have WADE'S name taken off the credit card accounts. WADE testified that MBNA MasterCard is currently pursuing him for payment of the account and that he believed that MBNA MasterCard was willing to accept monthly payments of $50.

[10]The DEBTOR testified that she did not know the amount of the loans, and that one loan existed at the time of the divorce and the other loan was taken out in 2002.

10

Document Page 11 of 18

*McNichols*, 255 B.R. 857 (Bankr.N.D.Ill. 2000).[11] Similarly, most courts had considered that debtors' payments on retirement plan loans were properly considered "disposable income" that they were required to contribute to their Chapter 13 plans.[12] Applying those rules here, deductions of $219.50 for 401(k) contributions and $328.35 for repayment of 401(k) loans, will not be allowed in determining the DEBTOR'S monthly net income.

Accordingly, this Court finds that the DEBTOR'S monthly net income is $3,218.[13] In arriving at that figure, this Court has accepted the DEBTOR'S testimony that her bonuses from Coca-Cola will be reduced from $7,500 to $1,800. The next step is to determine whether the DEBTOR has the ability to pay the debts at issue from income "not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor." The DEBTOR has itemized monthly living expenses of $2,568. WADE does not contend, and this Court does not find, apart from her housing expenses,

---

[11] A minority of courts had rejected such a *per se* rule, holding that the determination of whether retirement contributions are reasonably necessary for the support of debtors and their dependents should be determined on a case by case basis. *In re Taylor*, 243 F.3d 124 (2nd Cir. 2001). In *Taylor*, the court set forth a number of factors to be considered, including the debtor's age; the number of years remaining until retirement; the amount of the debtor's contribution; both the number and the nature of the debtor's dependents; and the total amount of pension contributions the debtor will have to "buy back" if the payments are discontinued. *Id*. at 129-30.

[12] Both of those rules have changed, however, with the enactment of the Bankruptcy Abuse and Consumer Protection Act of 2005 (BAPCPA). Section 1322(f), added by BAPCPA, provides that repayments of a qualified retirement plan "shall not constitute 'disposable income' under section 1325." Section 541(b)(7), another BAPCPA addition, excepts from property of the estate any amounts withheld by an employer for contribution to a qualified retirement plan, as well as any amount received by an employer from an employee for payment as a contribution to an employee benefit plan subject to ERISA or the Internal Revenue Code, providing specifically that such amounts "shall not constitute disposable income as defined in section 1325(b)(2)." *See In re Shelton*, 370 B.R. 861 (Bankr.N.D.Ga. 2007). These new rules only apply to Chapter 13 cases filed on or after October 17, 2005.

[13] Based on the DEBTOR'S payroll advices, her yearly gross income from Coca-Cola is estimated at $40,558 ($3,229.83 x 12 + $1,800). Because the DEBTOR testified that her income from her part-time job fluctuates each month, this Court has taken the gross income from her 2006 W-2 ($8,746 ÷ 12 = $729). From the DEBTOR'S gross income from both jobs of $49,304, the Court has deducted the federal income tax paid in 2006 of $2,724, state income tax of $1,437, social security deductions of $3,057 ($49,304 x 6.2%) and medicare deductions of $715 ($49,304 x 1.45%), arriving at a monthly income after payroll deductions of $3,448. As indicated above, the DEBTOR is entitled to deduct $230 for insurance premiums. Based on these calculations, her net monthly income is $3,218.

The Court recognizes that its calculations are not perfect. Inaccuracies, such as deducting the federal and state income taxes actually paid in 2006, which were based on a higher income, work in the DEBTOR'S favor.

that any of the expenses are unreasonable or unnecessary. The Court finds that the DEBTOR has disposable monthly income of $650, which she could apply to the credit card debts at issue, which total approximately $29,500, as of October, 2005. At that rate, it would take the DEBTOR approximately 6 ½ years to pay off those debts. *See In re Gengler*, 278 B.R. 146 (Bankr.N.D.Ohio 2002) (six to eight years is a reasonable time to pay off divorce obligation).

The second prong of Section 523(a)(15) requires the DEBTOR to establish that the benefit to her of discharging the debt outweighs the detriment to WADE. In balancing the benefit to the debtor and the detriment to the debtor's spouse, the test is one of "totality of the circumstances." *Matter of Crosswhite*, 148 F.3d at 888-89. The test must be applied on a case-by-case basis. Most courts do not limit the considerations to economic factors. *Matter of Gamble*, 143 F.3d 223 (5th Cir. 1998). Among the factors to be considered in making this determination are:

> the amount of the debt and the payment terms; the current income and expenses of the debtor and the creditor; the current assets and liabilities of the debtor and the creditor; the amount of the debt to be discharged in the bankruptcy; the health, job skills, age and education of the debtor and creditor; the age and any special needs of the dependents of the debtor and the creditor; any changes in the financial conditions of the debtor and creditor since entry of the decree; whether the creditor is eligible for bankruptcy relief and whether the parties have acted in good faith in filing the bankruptcy and litigation of the 11 U.S.C. § 523(a)(15) issue.

*In re Watkins*, 355 B.R. 10, 15 (Bankr.W.D.Ky. 2006).

The DEBTOR argues that WADE, based upon his inheritances, is in a superior financial position, even though he earns little or no income. She elicited, in painstaking detail, information as to the number and costs of trips he has taken with his girlfriend and

her children in the year preceding the trial. While WADE'S ability to pay the debts at issue is a factor to be considered, it is only one factor.

Based largely on equity, WADE contends that the DEBTOR'S conduct compels a determination that the debt is nondischargeable. WADE argues that the DEBTOR received sufficient property in the divorce to pay off the credit card obligations which she assumed under the settlement agreement approved by the divorce court. Prior to the divorce, the DEBTOR misappropriated sales proceeds of $31,000 from an RV bequeathed to WADE. He points to the significant amounts of cash which flowed in and out of her bank accounts following the divorce, as well as the many checks written to the gambling boat. Between May, 2004, and the time that the divorce was granted, the balance on the AT&T Universal Card had increased from $962 to $18,535.[14] At the time of the divorce, the minimum payment on the account was $275. At the time the DEBTOR filed bankruptcy, the balances owing on the two Discover cards totaled nearly $16,000. It is clear from an examination of the credit card statements that most of the charges were not for basic living expenses, but resulted from the DEBTOR'S uncurbed spending.

This Court's earlier determination that the DEBTOR'S obligation to pay the credit card debts at issue and to indemnify WADE from any liability are debts which were "incurred in connection with a divorce decree," and consequently subject to the ability to pay/benefit/detriment analysis mandated by Section 523(a)(15), does not render those

---

[14]After the divorce, the balance on the account increased each month. The DEBTOR continued to use the card for payment of ordinary expenses such as fuel purchases and telephone bills, for frequent meals out and for purchases at department and discount stores. By May, 2002, the minimum payment on the account was $1,065 and the balance had increased to $23,021.17.

13

debts "marital debts" in the traditional sense of the term. The charges made by the DEBTOR after the divorce was granted and after she agreed to close the accounts and refrain from making any additional charges, are akin to non-marital debt. As a general rule, under Illinois law, the spouse who incurs non-marital debt should be required to pay it. *In re Marriage of Lees*, 224 Ill.App.3d 691, 587 N.E. 2d 17 (Ill.App. 3 Dist. 1992).

For these reasons, the Court determines that the DEBTOR has failed to carry her burden to prove that the benefit to her of discharging the debt outweighs the detriment to WADE. Accordingly, the DEBTOR'S obligation to hold WADE harmless from liability on the AT&T Universal Card and the MBNA MasterCard accounts is determined nondischargeable under Section 523(a)(15).

WADE timely filed a proof of claim in the DEBTOR'S main case proceeding on May 6, 2006, in the amount of $35,510.81, as unsecured, based on her obligation under the divorce decree to indemnify him on the credit card debts that are at issue in this adversary proceeding. As evidenced by the attachments to WADE'S claim, he included in the amount claimed to be due the balances owed on the two Discover cards, on which he later determined that he is not liable.[15] The Trustee has filed a Final Report and Proposed Distribution, which shows a distribution to be made to WADE in the amount of $3,398.55, based on his claim as filed. Objections to that report and proposed distribution must be filed by September 18, 2007. Based on WADE'S testimony at trial, he has not been required to make any payments on either the MBNA MasterCard or the AT&T Universal Card. Given this Court's determination that the DEBTOR'S obligation to pay those debts and to

---

[15] Discover Bank filed two claims, in the amounts of $12,930.38 and $3,846.95. To the extent that WADE'S claim includes these two debts, it is incorrect.

14

indemnify WADE is nondischargeable, a distribution to WADE at this juncture of the proceeding based on the full amount of the credit card debt may not be appropriate. WADE'S claim against the DEBTOR is contingent.[16] The DEBTOR may consider returning to the divorce court to seek an order requiring WADE to apply those funds to the underlying debts. This Court will extend the date for the filing of objections to the Trustee's report until October 9, 2007.[17] If the DEBTOR files an objection to the proposed distribution to WADE, or the Trustee files an objection to WADE'S proof of claim, a hearing will be scheduled by the Court.

*Section 523(a)(2)(A)*

WADE also contends that the DEBTOR'S liability is nondischargeable under Section 523(a)(2)(A), which provides that:

> (a) A discharge under Section 727, . . . does not discharge an individual debtor from any debt –
> * * *
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A). Although three independent grounds for nondischargeability are listed, courts have historically applied a single, unified test to actions brought under this section. The traditional analysis contains the following elements: (1) the debtor made a representation to the creditor; (2) the debtor's representation was false; (3) the debtor possessed *scienter*, i.e., an intent to deceive; (4) the creditor relied on the debtor's

---

[16]Section 502(c)(1) of the Bankruptcy Code provides for the estimation "for the purpose of allowance . . . [of] any contingent or unliquidated claim, the fixing or liquidation of which . . . would unduly delay the administration of the case." 11 U.S.C. § 502(c)(1). This Court expresses no view on the proper estimation of WADE'S claim.

[17]An appropriate order will be entered in the main case proceeding.

misrepresentation, resulting in a loss to the creditor; and (5) the creditor's reliance was justifiable. *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).[18] The creditor must establish each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The determination of whether a debtor had the requisite intent to deceive the creditor is a factual question which is resolved by a review of all of the relevant circumstances of a particular case. *In re Paul*, 266 B.R. 686, 694 (Bankr.N.D.Ill. 2001).

Ordinarily, a fraudulent misrepresentation must relate to a past or existing fact, and may not be based upon a failure to perform a promise or agreement to do something at some future time. *In re Alicea*, 230 B.R. 492 (Bankr.S.D.N.Y. 1999). A broken promise to pay a debt does not, without more, render the debt nondischargeable. *In re Tellam*, 323 B.R. 661 (Bankr.N.D. Ohio 2005). In order to prevail, the creditor must establish that at the time the obligation was incurred there existed no intent on the part of the debtor to pay the debt as promised. *In re Highfill*, 336 B.R. 701 (Bankr.M.D.N.C. 2006)(former spouse must establish that debtor had no intention of paying the marital debts and holding spouse harmless when the agreement was signed); *In re Harrison*, 301 B.R. 849, 854 (Bankr.N.D. Ohio 2003); *In re Young*, 181 B.R. 555 (Bankr.E.D. Okla. 1995).

---

[18] In *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000), the court, expanding the definition of the term "actual fraud" to include nonrepresentational forms of fraud, stated:

> 'Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.' (quoting *Stapleton v. Holt*, 207 Okla. 443, 250 P.2d 451, 453-54 (Okla. 1952)).

Under the *McClellan* definition, for fraud not involving an affirmative misrepresentation, the creditor must establish (1) a fraud occurred; (2) the debtor was guilty of intent to defraud; and (3) the fraud created the debt that is the subject of the dispute. *In re Terranova*, 301 B.R. 509 (Bankr.N.D.Ill. 2003). Because this case concerns a misrepresentation, it is not necessary to conduct a *McClellan*-type analysis.

16

WADE contends that even though the DEBTOR consented to the terms of their settlement agreement, she never intended to pay the credit card debt she assumed under that agreement. WADE contends that he would not have agreed to pay the DEBTOR $75,000 from his retirement account if he knew that she had no intention of paying the credit card debts which were assigned to her. WADE points to the DEBTOR'S dissipation of the funds she received in the divorce, claiming that she had sufficient funds to pay the credit card debts.

Viewing the evidence as a whole, this Court finds that WADE failed to prove that the DEBTOR fraudulently induced him to enter into the settlement agreement or that the DEBTOR had no intention of complying with its terms when she signed it. There was no evidence introduced that the DEBTOR, at the time she entered into the agreement, intended to "load up" the credit cards on which WADE was liable and later file bankruptcy in order to avoid paying those debts. To the contrary, the DEBTOR paid $16,000 on the MBNA MasterCard, reducing the balance to $1,200 shortly after the divorce.

*Objection to Discharge*

In Count III of the amended complaint, WADE objects to the DEBTOR'S discharge pursuant to Sections 727(a)(2), (3) and (7), alleging that, with the intent to hinder, delay or defraud, the DEBTOR transferred, removed, destroyed or concealed property and that she has failed to provide documentation from which her financial condition could be ascertained.[19] Specific reference is made to the preferential transfer made to the DEBTOR'S

---

[19] Forming the basis for WADE'S objections to the DEBTOR'S discharge are the dissipation of funds received upon the divorce along with her escalating debt and her failure to provide records or explain what happened to such a significant sum of money over such a short time. In order to prevail on his objections under both Sections 727(a)(2) and (a)(4), WADE would need to prove actual intent to hinder, delay or defraud a creditor on the DEBTOR'S part. There is no evidence in the record that the DEBTOR spent the money or accumulated the debt with the intent to harm

17

brother. WADE also seeks denial of the DEBTOR'S discharge under Section 727(a)(4)(D), alleging that the DEBTOR knowingly and fraudulently withheld records and documentation relating to her property or financial affairs from her bankruptcy trustee. At trial, WADE abandoned those claims, stating in closing argument that his objections to discharge were resolved through the main case proceedings.[20]

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

### 

---

WADE or any of the other creditors. Nor is there any evidence that the DEBTOR fraudulently withheld any information from the bankruptcy trustee.

Section 727(a)(3) provides for denial of a debtor's discharge for failure to maintain and preserve adequate records from which the debtor's financial condition might be ascertained, unless the debtor's lack of record keeping is justified under all the circumstances. As a general rule, this provision is limited in application to sophisticated debtors who conduct a business involving significant assets. *In re Scott*, 172 F.3d 959 (7th Cir. 1999); *In re Tauber*, 349 B.R. 540 (Bankr.N.D.Ind. 2006) (debtor with gambling addiction need not keep a "win/loss diary").

Section 727(a)(7) has no application to this case. A court may deny a debtor's discharge under Section 727(a)(7) if the debtor has committed an act specified in Section 727(a)(2), (3), (4), (5), or (6) in connection with a bankruptcy case "concerning an insider." 11 U.S.C. § 727(a)(7). Essentially, this provision extends the basis for denial of the discharge to the debtor's misconduct in a substantially contemporaneously related bankruptcy. Explaining this provision, the court in *Whiteside F.S. Inc. v. Siefkin*, 46 B.R. 479, 481 (N.D.Ill. 1985), stated:

> The purpose and intent of Section 727(a)(7) of the Bankruptcy Code is to prevent debtors who are involved in several bankruptcy proceedings from failing to cooperate in a proceeding in which their own discharge is not at issue such as a corporate proceeding or a proceeding involving a partner or a relative and then, subsequently or simultaneously, obtaining an individual discharge in another case. Section 727(a)(7) is a statutory provision which ties related cases together so that misconduct in one case by an individual may be chargeable against that individual in other related proceedings.

[20]An adversary proceeding was brought by the Trustee of the DEBTOR'S bankruptcy estate, against Wesley Williamson, the DEBTOR'S brother, to recover a preferential transfer of $5,700. The matter was settled for the sum of $4,462.50.